IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| Laura Thompson, ) | |
| ) | Civil Action No. 7:06-1248-HMH-WMC |
| Plaintiff, ) | |
| ) | |
| vs. ) | **REPORT OF MAGISTRATE JUDGE** |
| ) | |
| Spartanburg County, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. In her complaint, the plaintiff alleges that the defendant terminated her employment in violation of the Family and Medical Leave Act ("FMLA"), as well as state law claims for breach of contract and wrongful termination in violation of public policy. In her response to the motion for summary judgment, the plaintiff has withdrawn her contract and public policy claims.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

The plaintiff began work at the Spartanburg County Detention Facility on October 27, 2003, as a Detention Officer I. On that date, she was issued, among other items, the Detention Facility Policy Manual (pl. dep. ex. 4). The plaintiff signed the "Uniform issue" (pl. dep. ex. 4) and placed her initials at the end of a paragraph containing the following language: "ignorance of policies or failure to understand policies does not

constitute reason for misconduct and or failure to comply with any and all policies and procedures addressed in this manual" (pl. dep. 27 and ex. 4) (emphasis in original). This same paragraph states that the plaintiff understands it is her responsibility to read the manual and ask questions if she does not understand its contents. *Id*. The plaintiff testified that she was aware when starting work at the Facility that it was her responsibility to read the manual and that ignorance of policies in the manual was not an excuse for failure to comply with those policies (pl. dep. 28).

In accordance with state law, the Detention Facility requires all new officers to receive certification training at the South Carolina Criminal Justice Academy ("Academy") within their first year of employment. This requirement appears in several places in the Facility policy manual. Among the qualifications listed for Detention Officer I is the following: "submit all appropriate paperwork to South Carolina Criminal Justice Academy upon employment and satisfactory completion of all course work within one (1) year of date of hire" (pl. dep. ex. 5). In a section on Training and Staff Development, the Facility manual again sets forth this requirement: "by S.C. law, all officers must attend the S.C. Criminal Justice Academy and pass all required course work to maintain their certification. Failure to attend, complete, and or pass all required course work will result in dismissal" (pl. dep. ex. 6 ¶ 2.8). In the section of the manual devoted specifically to detention officer training, the handbook states: "During the first year of employment, officer will attend and pass all course work as required by the S.C. Criminal Justice Academy" (pl. dep. ex. 7 ¶ 2.3).

The policies of the Facility follow the requirements of State law as embodied in S.C. Code Ann. § 23-6-430 (2005) (repealed effective May 30, 2006) (pl. dep. ex. 42). The law provides that any public law enforcement agency in South Carolina may employ a law enforcement officer who is not certified by the Department of Public Safety if, "within one year after the date of employment or appointment the person secures certification from the Department . . . ." S.C. Code Ann. § 23-6-430. The law further provides that if any law

enforcement officer fails to secure certification within one year from the date of his employment, "he may not perform any of the duties of a law enforcement officer involving control or direction of members of the public or exercising the power of arrest until he has been certified." *Id*. Moreover, such a person may not be employed by any other agency in South Carolina as a law enforcement officer, "nor is he eligible for any compensation by any law enforcement agency for services performed as an officer." *Id*.

The statute provides that exceptions to the one-year rule "may be granted" by the Director of the South Carolina Department of Public Safety in the following circumstances: 1) Military leave or injury occurring during that first year which would preclude the receiving of training within the usual period of time; 2) a timely filed application for training which cannot be honored by the Academy within the prescribed period; 3) where an officer–candidate has successfully completed equivalent training in another state; or 4) if it is determined that the training will result in undue hardship to the requesting agency, such agency must propose an alternate training schedule for approval. *Id*. The only mandatory exception to the one-year requirement exists if a candidate for certification begins a period of state or federal military service within one-year after his date of employment. In such a case, the period of time in which the candidate must obtain the certification is automatically extended for a period of time equal to the time the candidate performed active duty, plus 90 days. At no time during her employment was the plaintiff eligible for this mandatory military exception.

To the defendant's knowledge, all other officers hired by the defendant have received this training within their first year of employment unless they were separated from employment before their first year anniversary. To the defendant's knowledge, no employee at the Detention Facility has received an extension as to this one-year requirement (Woody dep. 15; Woody aff. ¶ 6; Freeman dep. 19). In addition, no employee other than the plaintiff has been terminated by the Facility for not meeting this one-year

requirement (Powers aff. ¶ 3). The Director of the Facility, Mr. Powers, has not previously asked for an exception to the one-year requirement (Powers dep. 56).

The plaintiff was aware of the requirement for attending the Criminal Justice Academy training (pl. dep. 30, 34). This requirement for certification training at the Academy was discussed with the plaintiff by one of the training officers, either Sgt. Eric Woody or Sgt. Mark Freeman (pl. dep. 34). Prior to the plaintiff's employment with the defendant, Sgt. Freeman ran a criminal check on the plaintiff under her married name; there were no charges (Freeman dep. 9; Freeman aff. ¶ 1; pl. dep. ex. 3). On her employment application, the plaintiff said she had not been convicted of a crime (pl. dep. 22-23). After she was hired, Sgt. Mark Freeman discovered that the plaintiff had a criminal record, and that the charges failed to show a disposition (Freeman dep. 9; pl. dep. ex. 3). The plaintiff admits that she has criminal records from the States of Florida and Delaware (pl. dep. 17-26, ex. 3). When the plaintiff was 13 or 14 (in or about October 1988), she was arrested in Delaware for "Financial Transaction Card Fraud," Conspiracy Third and Attempted Theft (pl. dep. 18, 19, 24, ex. 3). The plaintiff does not know the disposition of this charge (pl. dep. 19). When the plaintiff was 17, she was arrested in Florida for applying for an I.D. card under a friend's name; she was charged with Fraud and False Application for a Driver's License (pl. dep. 21-22, 25, ex. 3). The plaintiff guesses that she was convicted of this charge (pl. dep. 22). The plaintiff was arrested for underage consumption in 1989 and does not know the disposition of this charge (pl. dep. 25-26, ex. 3).

According to Mary Brown, who is employed in the Registrar's Unit of the Academy, certain documents are required before a candidate will be confirmed into a class. If an NCIC criminal history check shows any arrests, evidence of the final disposition of all charges must be provided (Brown aff. ¶¶ 1-2). Sgt. Freeman informed the plaintiff that she needed to provide him documentation showing the disposition of her criminal charges before she could enroll at the Academy (Freeman dep. 14). Sgt. Eric Woody, the training

4

officer responsible for filling out Academy paperwork, also informed the plaintiff that she needed to provide evidence of the disposition of her criminal charges (pl. dep. 18; Woody dep. 13). The plaintiff admits that she was required to provide documentation showing the disposition of all criminal charges before she could enroll at the Academy (pl. dep. 38, 44). The plaintiff further admits that Sgt. Woody or Freeman reminded her of the need to provide dispositions of her charges (pl. dep. 38, 41-42).

The plaintiff never provided Sgt. Freeman or Sgt. Woody with documentation showing the disposition of her criminal charges (pl. dep. 43; Freeman dep. 14; Woody dep. 16). Because of the plaintiff's failure to provide the required documentation, Sgt. Woody was not able to complete the paperwork which would have allowed the plaintiff to register for her required training (Woody dep. 16).

Like all new recruits, the plaintiff was scheduled to attend classes at the Academy based on the number of seats allocated to the Spartanburg Facility (Freeman dep. 10). Classes are scheduled approximately every month and a half, and the Spartanburg Facility usually sends two officers for training at a time (Freeman dep. 10). Once an officer is scheduled for training, she is informed verbally by the training officers of the class dates and her name is placed on a bulletin board in the training room (Freeman dep. 11, 13). According to Sgt. Woody, the plaintiff's name was listed on the bulletin board as being scheduled for training (Woody dep. 21). However, the plaintiff claims that she never saw her name on the bulletin board as being scheduled for a class (pl. dep. 47).

Prior to beginning certification classes, candidates must travel to Columbia for registration (Woody aff. ¶ 1). Candidates must present to the Academy a completed form, along with all of the required paperwork (Woody aff. ¶ 1). Sgt. Woody ensures that the officer has all the required documents before she is allowed to register (Woody dep. 7). Before the plaintiff could enroll at the Academy she had to list all criminal charges and show the disposition of the charges (pl. dep. 38-39, ex. 9; Brown aff. ¶ 2). Thus, because the

plaintiff failed to provide the disposition of her criminal charges, she was never able to register for any classes. Consequently, as the time approached to register for the class for which she was scheduled, another candidate would be substituted for the plaintiff, and the plaintiff would be rescheduled for a later class (Woody aff ¶ 5). This process continued during the entire period of her employment (Woody aff. ¶ 5). Sgt. Woody is responsible for scheduling officers for the required training at the Academy (Woody aff. ¶ 1; Woody dep. 6-7). The plaintiff was signed up and scheduled to attend training classes the following dates: December 7 - December 19, 2003; May 24 - June 11, 2004; November 29 - December 17, 2004; February 7 - February 25, 2005; April 2 - April 22, 2005; August 8 - August 26, 2005; and November 28 - December 16, 2005 (Woody aff. 3). Sgt. Woody removed the plaintiff's name from the classes scheduled for December 7 - December 19, 2003; February 7 - February 25, 2005; and April 2 -April 22, 2005, because the plaintiff had failed to provide the defendant documents as to the disposition of her arrests (Woody aff. ¶ 3). During the other classes, the plaintiff was on leaves of absence and thus could not attend the classes; however, even if she had not been absent, her failure to provide the defendant with documents as to the disposition of her arrests would have disqualified her from attending the class (Woody aff. 4; Woody dep. 16).

When asked whether she provided the information requested by the Detention Facility regarding her criminal charges, the plaintiff testified that she "got contact information for Delaware and Florida, like their SLED, I don't know what they're called. And, I gave that information to Sgt. Freeman" (pl. dep. 39). The plaintiff also testified that she obtained copies of documents from Delaware and Florida relating to her criminal charges (pl. dep. 40). The plaintiff admitted, however, that these documents did not show the disposition of any criminal charges, and that she never gave these documents to the Facility (pl. dep. 39-41). When asked why she was not able to get a final disposition of her criminal charges, the plaintiff answered, "I don't know" (pl. dep. 44). When the plaintiff was asked what she

6

was told by these people, she responded, "I don't recall now. It was two years ago" (pl. dep. 44). The plaintiff admits that someone may have told her of the dispositions of her criminal charges, but she did not get any documents about such dispositions (pl. dep. 59). She admits that it was her responsibility to obtain this disposition documentation (pl. dep. 40, 41). The plaintiff knew she had to fill out an information packet and file it in Delaware, but she did not do this (pl. dep. 59). She admits that she made no efforts to follow-up or obtain the required documentation (pl. dep. 44).

The Director of the Facility, Larry Powers, was not informed that the plaintiff had failed to complete her required training at the Academy until August 2005 when he was reviewing employee records (Powers dep. 52, 55-56; Freeman dep. 18, 23; Woody dep. 18). At this point, the plaintiff had been employed with the Detention Facility for approximately 22 months, which is 10 months longer than allowed by statute and the defendant's policy. According to Mr. Powers, once he discovered that the plaintiff had failed to complete her required training, he terminated her employment (Powers dep. 43, 48). In the termination letter to the plaintiff, dated August 16, 2005, Mr. Powers stated in pertinent part:

> [A]ll individuals hired as law enforcement officers, including detention officers, have to undergo mandatory training and meet applicable state certification requirements within the first year of their employment, and should they fail to do so, they cannot perform the duties of said officers. During your employment, you have been scheduled to attend state mandated training as follows:
>
> (a) December 7-December 19, 2003
> (b) May 24-June 11, 2004
> (c) November 29-December 17, 2004
> (d) February 7-February 25, 2005
> (e) April 18-June 6 2005[1]

---

[1] This date should be April 4, 2005-April 22, 2005 (Woody aff. ¶ 3)..

> However, prior to your attendance on each of these dates, you have either been involved in a traffic accident requiring you to be out of work; been hospitalized due to an on-going medical condition; and/or have postponed attendance for other valid reasons. In each case, we have reasonably accommodated your need to be absent from training, and we have made every effort to work with you to continue your employment.
>
> Realizing that you are now out of work due to current medical problems, nevertheless, I can no longer continue to ignore state law, and as a result, it is my decision to terminate your employment at this time due to the fact that South Carolina State Law precludes you from further service as a law enforcement officer. . . .

(Pl. dep. ex. 1). Mr. Powers testified in his affidavit that he would have terminated the plaintiff even if she had never taken FMLA leave and even if she had not been on leave in August 2005 (Powers aff. ¶ 4).

The defendant maintains an FMLA policy of which the plaintiff was aware (pl. dep. ex. 20; pl. dep. 83). The plaintiff was granted extensive periods of leave even before she became eligible for FMLA. She was absent from work due to back problems on December 19 - December 20, 2003 (pl. dep. 95, ex. 21). She was absent January 24 - 25, 2004 (pl. dep. 98, ex. 12). The plaintiff was also absent on February 6, 2004 (pl. dep. 98-99, exs. 13, 22), and February 23, 2004 (pl. dep. ex. 13). The plaintiff was absent on April 8 and 9, 2004 (pl. dep. 99-100, exs. 13, 23). The plaintiff was out of work from May 10 through July 19, 2004, for medical reasons (pl. dep. 100-105; exs. 13, 24, 25, 26, 27). During this nine-week leave (49 days), the plaintiff requested and was granted multiple extensions. Because she was not eligible for FMLA leave, the plaintiff relied upon accrued sick leave, holidays, and vacations (Powers dep. 12). Once an employee exhausts all accrued leave, she may, at the discretion of the Director of the Detention Facility, be allowed to take leave without pay (Powers dep. 12-14). The decision to grant leave without pay is made by the Director, Mr. Powers (Powers dep. 14). Although the plaintiff exhausted her accrued paid leave on June 4, 2004, Mr. Powers allowed her to remain employed and

granted her leave without pay to cover her absences until she was able to return to work (Powers dep. 30). The plaintiff returned to work on July 20, 2004 (pl. dep. 105). She was then absent on July 23 and July 24, 2004 (pl. dep. ex. 13, pl. dep. 106). After each absence identified above, it is undisputed the plaintiff was returned to her same job (pl. dep. 98, 105-106).

On September 1, 2004, the plaintiff was involved in an automobile accident while at work. Although she was not hospitalized as a result of this accident, she was placed on light duty. Because the Facility had no light duty for detention officers, the plaintiff was unable to return to work until December 6, 2004, when she returned to her same job (pl. dep. 106-113, exs. 13, 31, 32). It was during this leave that the plaintiff became eligible for leave under the FMLA. This was acknowledged by a letter sent to the plaintiff on November 15, 2004, by Mr. Powers, indicating that, as of that date, she had used 13 of her allotted 60 days under the FMLA (pl. dep. ex. 31). The letter indicated the days remaining under FMLA, and requested information about the plaintiff's possible return to work.

The plaintiff acknowledged in her deposition that she was given all of the FMLA leave to which she was entitled during 2004:

> Q:    Okay. So, there were no days in 2004 in which you were denied FMLA leave that you were entitled to; is that correct?
>
> A:    Correct.
>     . . .
> So, I'm just asking if there were any days that you're aware of that were counted against you as an absence that should have been covered by FMLA?
>
> A:    No.

(Pl. dep. 113-114).

The plaintiff's next absences occurred on February 25-26, 2005, when she missed two days because of the flu. Because this was not a serious medical condition, the

9

plaintiff acknowledged that her absences did not qualify for FMLA (pl. dep. 115-116, ex. 33). The plaintiff also missed work on March 28, 2005, an absence she acknowledges was not covered by FMLA (pl. dep. 116, ex. 34). In April 2005, the plaintiff was involved in another automobile accident and was out of work from April 8 until April 26. Mr. Powers approved these absences as qualifying for FMLA leave (Powers dep. 39; pl. dep. 117-118, ex. 35). The plaintiff's next absences occurred from June 11 through June 17, 2005 in which she missed four days of work (pl. dep. 119-120, exs. 14 and 36). These June absences were approved by Mr. Powers under the FMLA (Powers dep. 39). The plaintiff was absent on July 20, 2005, and July 23, 2005 (pl. dep. 122-123, exs. 14, 38, 39). These absences were not FMLA leave. *Id*.

A more extensive absence began on July 29, 2005 and continued through the plaintiff's date of termination, August 20, 2005 (pl. dep. ex. 40). These absences, during which the plaintiff was hospitalized for a time, were approved as FMLA absences by Mr. Powers (Powers dep. 41).

In her deposition, the plaintiff admitted that during the year 2005 she was given all of the FMLA leave she was entitled to:

> Q: During the calendar year of 2005, were there any absences that were not counted as FMLA that should have been?
>
> A: No.
>
> Q: Were there any days where you requested FMLA leave that you think were improperly denied?
>
> A: No.

(Pl. dep. 125).

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759

F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## **ANALYSIS**

As set forth above, the plaintiff has withdrawn her claims for breach of contract and wrongful termination in violation of public policy. Accordingly, her only viable claim is for retaliation in violation of the FMLA. The FMLA provides eligible employees of a covered employer the right to take unpaid leave for a period of up to 12 work weeks in a 12-month period for, among other things, a serious health condition. 29 U.S.C. § 2612(a)(1). An eligible employee is someone who has been employed by an employer at least 12 months, worked at least 1,250 hours in the previous 12 months, and the employer employs at least 50 employees at the worksite or within 75 miles of the worksite. *Id.* § 2611(2). The plaintiff began work for the defendant on October 27, 2003, and was thus not eligible to take FMLA leave until October 27, 2004. The FMLA makes it unlawful for an employer to retaliate against an employee for exercising her substantive rights under the law. 29 U.S.C. § 2615 and 29 C.F.R. § 825.220(c).

The plaintiff claims that the defendant terminated her employment because she had taken FMLA leave "or the anticipation of such leave" and further alleges that the defendant used her FMLA leave against her (am. comp. ¶¶ 20-22). To establish a claim for retaliation under the FMLA, the plaintiff may rely on the *McDonnell Douglas v. Green,* 411 U.S. 792 (1973) proof mechanism. *Yashenko v. Harrah's NC Casino Company LLC,* 446 F.3d 541, 551 (4th Cir. 2006). The plaintiff may make out a *prima facie* case of retaliation by establishing that (1) the plaintiff engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action. *Id.* If she succeeds in establishing a *prima facie* case, the defendant has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the defendant does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture, and the burden shifts back to the plaintiff to show that the given reason was a pretext for discrimination. *Id.*

For purposes of this motion, this court will assume that the plaintiff can establish a *prima facie* case of retaliation in violation of the FMLA. The defendant has come forth with a with a legitimate, nondiscriminatory reason for the plaintiff's termination from employment – she did not complete certification within one year after the date of her employment as required by state law for law enforcement officers. *See* S.C. Code Ann. § 23-6-430. Accordingly, the burden shifts back to the plaintiff to show that the given reason was a pretext for discrimination.

As set forth above, in 2004, the plaintiff was absent 128 days (or 25 weeks), with 28 days (or 5.5 weeks) being classified as FMLA leave. The plaintiff was not denied any FMLA leave in 2004, and after each absence she was returned to her same job in all respects (pl. dep. 113). In 2005, the plaintiff was absent 24 days prior to July 29, 2005, with 19 of the days counted as FMLA. The plaintiff began an FMLA leave on July 29, 2005,

which continued until her termination date on August 20, 2005. The plaintiff admitted that during the year 2005 she was given all of the FMLA leave to which she was entitled (pl. dep. 125).

The plaintiff argues that the defendant improperly used her prior FMLA days to support terminating her employment and this is evidence of pretext. In the termination letter, Mr. Powers listed five training dates that the plaintiff had missed. According to the plaintiff, she was on FMLA leave during three of these five dates (dates (c), (d), and (e)). However, as pointed out by the defendant, even if the plaintiff had not been out on FMLA leave during these training dates, she would not have been able to attend training because she failed to submit disposition documents about her arrests. Further, the three FMLA periods occurred *after* the plaintiff's first year of employment. Also, the plaintiff was scheduled to attend Academy training on two dates that were not referenced in the letter: August 8-26, 2005 and November 28-December 16, 2005 (Woody aff. ¶ 3).

The defendant cites two cases in support of its argument that it was allowed to consider the FMLA absences in determining whether the plaintiff met the training requirement. In *Taylor v. Union Institute*, Nos. 99-4443, 00-4026, 2002 WL 252443 (6th Cir. 2002), the plaintiff and other employees were given 60 days to increase student enrollment; however, the plaintiff was on FMLA for 30 of those 60 days. *Id*. The employer argued that it was the plaintiff's historically poor recruiting efforts prior to FMLA leave which caused it to select her for termination. *Id*. at *9. Thus, the Sixth Circuit upheld the employer's summary judgment award and concluded that the defendant met its burden of presenting a legitimate nondiscriminatory reason for the plaintiff's termination and that the plaintiff could not meet her burden of proving that the defendant's reasons for termination were pretext for retaliation. *Id*. Simply put, "the FMLA does not protect an employee on leave from an adverse employment decision that would have otherwise occurred had she not taken leave." *Id.* at *8.

14

In *McCoy v. Orleans Parish School Bd.*, No. Civ.A. 02-2510, 2004 WL 831141 (E.D. La. 2004), an employee was reassigned to a different job upon her return from FMLA leave. A letter from the plaintiff's supervisor which recommended the plaintiff be reassigned mentions the plaintiff's FMLA absences as a reason for the recommendation. Despite the references to the plaintiff's FMLA absences, the *McCoy* court concluded that the employer "produced evidence of a legitimate, nondiscriminatory reason for plaintiff's reassignment" and that the plaintiff failed to produce evidence that "defendant's asserted reasons were pretextual." *Id*. at *5. Similarly, the Fourth Circuit does not require that an employer suspend its job requirements for an FMLA leave taker when she is on FMLA leave. *Yashenko*, 446 F.3d at 550.

In support of her pretext argument, the plaintiff further argues that Mr. Powers knew of the plaintiff's lack of training but took no action until she went out on FMLA leave. However, the evidence before the court shows that Mr. Powers has consistently stated that he first learned of the plaintiff's lack of training in August 2005 during a review of employee records, and the plaintiff was fired immediately thereafter (Powers dep. 52, 55-56). Further, Sergeants Freeman and Wood testified that they did not tell Mr. Powers of the plaintiff's criminal record and her failure to attend training classes (Freeman dep. 14, 18; Woody dep. 11, 12, 18). The plaintiff has no evidence in support of this pretext argument.

Next, the plaintiff contends that the defendant's "post termination attempt to change their termination reason supports pretext." Specifically, the plaintiff claims that "the defendant now makes the claim that Plaintiff was not even eligible to be signed up for training because she did not provide Defendant with paper work that demonstrated disposition from her juvenile charge from Delaware and Florida. This factual position of the Defendant lacks merit, and credibility to even be believable" (pl. resp. m.s.j. 9-10). The plaintiff points out that the termination letter does not mention the plaintiff's failure to provide the needed paperwork.

The evidence is clear that the defendant's position is and always has been that the plaintiff was terminated for failing to complete her Academy training within one year (Powers dep. 20, 43). The termination letter makes no mention of the plaintiff's failure to provide the disposition paperwork because Mr. Powers was unaware of the plaintiff's criminal charges or her failure to provide disposition evidence at the time of her termination (Powers dep. 55; Powers aff. ¶ 2)).

It appears that the plaintiff is arguing that the defendant must ignore its training within one year requirement because the plaintiff was scheduled for training on days that she was on FMLA leave. Under the plaintiff's theory, she was entitled to return to work on or about the date of her second anniversary with the defendant and try again to attend training, even though she still had not provided dispositions of her criminal charges. To the defendant's knowledge, every other officer who has reached the one-year anniversary date has completed the training. The plaintiff's theory apparently is that an FMLA leave taker must be shielded from an employer's policy and thus must have "greater rights than those provided to employees not on leave." *Yashenko*, 446 F.3d at 548. As argued by the defendant, the plaintiff's position "[upsets] the careful balance that Congress has created between employees' need for protected family and medical leave and employers' need to protect their legitimate business interests – an outcome wholly inconsistent with the purposes and goals of the FMLA." *Id.*

The plaintiff also contends that Mr. Powers should have sought an extension for her to receive training since she was injured during the eleventh month of her employment. However, as pointed out by the defendant, the permissive exception in S.C. Code Ann. § 23-6-430 applies to an injury that precludes a person from receiving training within one year. However, in this case, even if the plaintiff had not been injured, she could not have registered for classes at the Academy because she had not provided documents showing the disposition of her criminal charges. Further, even if the plaintiff was qualified

for the exception, it is permissive, and Mr. Powers was under no obligation to seek such an exception, and he has not done so in the past (Powers dep. 56). Furthermore, the plaintiff *did* get an exception to the rule, because her employment and opportunities to attend the Academy went far beyond the one-year period of time (Powers dep. 53).

The plaintiff also argues that she attempted to get documentation showing the disposition of her criminal charges, but was unsuccessful in doing so. However, as set forth above, the evidence shows that the plaintiff was not terminated for failure to produce documents but for failure to complete mandatory training. Nonetheless, it is clear that the plaintiff was aware of the requirement for training at the Academy (pl. dep. 30, 34), and she admits that she was reminded on two or three occasions that she needed to provide documents showing the disposition of her criminal charges (pl. dep. 24, 38, 41, 42). According to the plaintiff, she made telephone calls to Delaware and Florida but "got as far as she could with it, as in making all the phone calls . . . [and that she] gave that information to Sgt. Freeman" (pl. dep. 39). However, the plaintiff also testified that she knew she could obtain her Delaware records by completing an "information packet and [filing] it in Delaware," but that she did not do so (pl. dep. 59). When asked why she was not able to secure disposition evidence for her criminal charges, she answered, "I don't know" (pl. dep. 44). When asked if she ever tried to get actual court records showing the disposition of her charges, she responded, "I don't remember" (pl. dep. 59).

In her response to the motion for summary judgment, the plaintiff now argues that she did not have access to her own criminal records under Florida and Delaware statutes. The plaintiff cites a Delaware statute to support her contention that she could not access her Delaware criminal records (pl. resp. m.s.j. 10-11). However, as pointed out by the defendant, the statute she cites discusses access to expunged records, and there is no evidence that the plaintiff's juvenile record had been expunged. The defendant presented the affidavit of the Judicial Case Processor in the Records Department of Delaware's

Family Court, who testified to the procedures whereby the subject of juvenile records can obtain copies of her records and disposition information (def. reply ex. 6).

The plaintiff also argues that under Florida law her records are sealed and available only for the purpose of background checks for child care personnel (pl. resp. m.s.j. 11). However, the statute cited by the plaintiff pertains only to certain crimes, and the crime for which the plaintiff was arrested is not listed in the statute (def. reply ex. 9, 10). Further, the defendant presented the affidavit of an employee of the General Counsel's Office with the Department of Juvenile Justice in Florida, who testified that an individual can obtain copies of his or her juvenile records by providing a notarized request or a standard legal release (def. reply ex. 5). Most importantly, whether or not the plaintiff had access to her criminal records is immaterial as the plaintiff is in exactly the same position. In either case, if the plaintiff did not have access to the records or if she had access to the records but simply did not complete the paperwork to get the records, she would still be unable to attend the Academy and was thus ineligible for employment as a detention officer.

Lastly, the plaintiff contends that pretext is evidenced by the fact that her evaluations make no mention of her failure to provide the disposition information (pl. resp. m.s.j. 10). The plaintiff's supervisor testified that he did not verify that she had completed training before filling out the evaluation, because the plaintiff had been employed well over a year and it was normal for employees employed that length of time to have completed their training (Dunn aff. ¶ 3). The plaintiff also points out that she received a "meets expectations" rating on her evaluations. This fact is irrelevant as the plaintiff was not terminated for performance reasons.

Based upon the foregoing, the plaintiff has failed to meet her burden of showing that the reason given by the defendant for her termination from employment was a pretext for discrimination.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the defendant's motion for summary judgment be granted.


                                        s/William M. Catoe
                                        United States Magistrate Judge

August 3, 2007

Greenville, South Carolina